## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 17-14340-CIV-MAYNARD

KELLY M. MCCARTNEY,

       Plaintiff,

v.

NANCY A. BERRYHILL, Acting Commissioner,
Social Security Administration,

       Defendant.

_____/

FILED by _____ D.C.

JUN 1 3 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

### ORDER ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT (DE 14 & 16)

**THIS CAUSE** comes before this Court upon the above Motions.
The telephonic hearing was set for June 12, 2018. On the date
and time for that hearing, counsel for Defendant called Chambers
to report that she has not been able to reach the Plaintiff at
her telephone number of record. (In its Order (DE 13) setting
the hearing this Court advised the Plaintiff to give the
Defendant a telephone number where she could be reached.) Nor
did the Plaintiff call Chambers separately. Therefore the
telephonic conference did not take place. This Court will not
re-set the telephonic conference. Instead this Court will rule
on the basis of the existing record. The existing record
provides an ample basis by which to rule. Therefore, having
reviewed the Motions, the Defendant's Response (DE 22), and the

Administrative Record (DE 12) and without holding a hearing, this Court finds as follows:

## BACKGROUND

1.    The Plaintiff applied for supplemental security income under Title XVI of the Social Security Act in January 2013. The application was denied at the first two administrative levels of review. On August 31, 2016, following a hearing, an Administrative Law Judge ("ALJ") rendered a decision finding the Plaintiff not disabled under the terms of the Social Security Act. The Appeals Council denied the Request for Review on July 28, 2017, thereby leaving the ALJ's decision final and subject to judicial review.

2.    The Plaintiff attended school through the 8th grade, leaving in 1990. From 1990 to 2008 she worked as a cashier for different retailers and restaurants. Her work history is sporadic.

3.    The disability application at issue here is not her first. At some point before September 2008 she had applied for disability benefits. The basis of that disability claim is unknown. From this period of time the instant record contains only one medical record: a consultative psychological evaluation by Dr. Schell dated September 11, 2008. Although a psychological evaluation, the Plaintiff emphasized physical health complaints:

she complained of varied and severe pain that she attributed to a fractured back injury from September 2003. Dr. Schell observed pronounced pain behaviors. The Plaintiff reported taking a wide variety of opioid and other pain medications. As for her mental health complaints, she reported a history of mood swings, irritability, and poor concentration as well as past mental health treatment. She was not currently seeking mental health care, however. She cried during the appointment, and she had a detached and somatic affect. Dr. Schell otherwise reported a normal mental status. Dr. Schell diagnosed Attention Deficit Disorder (based on the Plaintiff's report), Bipolar Disorder II, somatization disorder chronic pain-type, and borderline personality disorder. Dr. Schell noted the presence of severe non-medical psycho-social stressors with work and social components, and he gave a GAF score of 64.

4.    In July 2009 the Commissioner denied that first application at the reconsideration level of administrative review. In 2009 and 2010 the Plaintiff worked as a CNA home health aide. None of her work history reached the substantial gainful employment level.

5.    The medical record resumes in February 2011. The Plaintiff had gone to the Treasure Coast clinic complaining of very severe pain in her right hand. The examination was overall

normal except for reduced grip strength. The Plaintiff was prescribed Meloxicam and Tramadol. In May 2011 the Plaintiff began working as a veterinary technician.

6.   On September 11, 2012 she was involved in a car accident: she rear-ended a car that had pulled out in front of her. (A personal injury lawyer represented her for this accident.) She did not return to work afterwards; the date of this car accident is her date last worked.

7.   The Plaintiff went to the hospital after that car accident. She complained of a wide variety of very severe pain. A wide variety of radiographs and other diagnostic studies were performed, but no objectively determinable abnormality was found to explain her subjective pain complaints. The doctor suspected symptom exaggeration. The diagnosis was limited to cervical strain possibly accompanied by right shoulder and hip strain, too. The doctor noted a bulge at the C5-6 disc.

8.   The hospital had given the Plaintiff opioid pain medication during her stay. She returned to the hospital on September 19th requesting oxycodone. She complained of neck and back pain. The attending doctor regarded her neck pain complaints as disproportionate to what the objective medical evidence shows. Cervical spasm and neck pain were diagnosed, and Toradol and Flexeril were prescribed.

9.      Starting on September 19th the Plaintiff began seeing a chiropractor, Dr. Labella, D.C. She saw him for regular appointments through November 14th. At that last treatment note of record the Plaintiff reported a wide variety of severe pain complaints.

10.     MRI's were taken on October 23, 2012. The MRI of her cervical spine showed bulges at the C2-3, C3-4, and C4-5 discs. The MRI of her lumbar spine showed bulges at the L4-5 and L5-S1 discs. Neither the cervical nor the lumbar bulges were causing nerve compression.

11.     At that last appointment with Dr. Labella, the Plaintiff stated that she wanted a new "OD" which this Court presumes to mean a new osteopath or orthopedic doctor. The record contains no orthopedic treatment notes leading up to this point in time, however. Evidently the Plaintiff did find a new orthopedist because on November 30th she began seeing Dr. Simon. The Plaintiff repeated her complaints of wide-ranging and very severe pain. The Plaintiff recalled pain so severe that it left her wheelchair-bound for two months (a circumstance which the preceding record does not show). Likewise she described the car accident, itself, in terms more severe than she did at the hospital. Dr. Simon was unable to conduct an adequate physical examination. He prescribed Percocet.

12. The Plaintiff returned to Dr. Simon on December 21st. At this appointment Dr. Simon reviewed the MRI's. He read the lumbar MRI as showing a herniation at the L5-S1 disc for which he saw need for surgery. He saw no acute abnormality in the Plaintiff's cervical spine.

13. On January 17, 2013 the Plaintiff filed the disability application under review here. She claimed a wide range of pain complaints and a wide range of very severe impairments stemming therefrom. She denied taking any medications for the pain (although Dr. Simon was prescribing Percocet). A case worker observed exaggerated pain behaviors. The Plaintiff also claimed pain-related depression and poor sleep.

14. On January 25th the Plaintiff returned to Dr. Simon. She asked for an increase of her Percocet medication. Up to this point she had been unable to begin treatment with a pain management provider, she told him. At the next appointment on February 14th a colleague of Dr. Simon, Dr. Billinghurst, again referred the Plaintiff to pain management. The diagnosis that Dr. Billinghurst gave was of cervical and lumbar disc bulges and chronic pain syndrome. Dr. Billinghurst mentioned neither a herniation nor need for surgery.

15. On March 11, 2013 the Plaintiff saw Dr. Mihalovich for a consultative psychological evaluation. The Plaintiff reported

symptoms of depression, anxiety, and agitation. The mental status examination was consistent with those symptoms. Dr. Mihalovich diagnosed (1) Pain Disorder with physical and psychological factors and (2) Personality Disorder NOS ("not otherwise specified") with possible borderline features.

16.    On June 11, 2013 a chiropractor, Dr. Douglas, DC, filled out a Physical Capacity Evaluation questionnaire. He opined that the Plaintiff has a disabling degree of functional impairments. He stated that the Plaintiff limps from low back pain, has two bulging lumbar discs, and is unable to bend at the waist. He stated that neuropathy prevents frequent extremity use. Lastly he stated that the Plaintiff has seasonal allergies. However he declined to consider whether the Plaintiff has any mental health-related impairments.

17.    At some point in 2013 the Plaintiff was incarcerated for manufacturing methamphetamine. She was incarcerated for 18 months. As a result of that criminal offense, she lost her CNA license.

18.    Shortly after release, on October 8th, she was riding a bicycle when a city bus hit her. From the Plaintiff's description of this accident and the nature of the subsequent treatment notes, it appears that the accident was relatively non-severe. There is no indication of acute trauma, for example.

Nor are there hospital records. Medical records related to this injury event begin instead on October 20th with an appointment with Dr. Leotta, an orthopedist and neurosurgeon. The Plaintiff complained of pain in her right ankle, left arm, neck and back. The physical examination and radiographs were overall unremarkable. Dr. Leotta said she could stop wearing her ankle brace and return to normal weight-bearing. He recommended physical therapy, and he prescribed Mobic and Flexeril.

19.   That same day, on Dr. Leotta's referral, the Plaintiff saw Dr. Bistline for pain management services. The Plaintiff repeated her complaints of neck pain, low back pain, and ankle pain. She recalled similar pain complaints from the earlier car accident, but therapy had fully relieved them, she reported. Instead it was this recent bus accident that caused them to return---as well as caused the new complaint of foot pain. She ambulated with crutches at the appointment. Dr. Bistline prescribed Norco. She increased its dosage at the Plaintiff's request at the November 17th appointment.

20.   The Plaintiff returned to Dr. Leotta on December 8th. She only reported right ankle pain to him. He administered an injection of Medrol to her ankle, and he prescribed Voltaren gel for it, too. He continued her Mobic and Flexeril prescriptions.

21.  MRI's were taken on December 11th. The MRI of her cervical spine showed a bulge at C5-6 that was causing cord impingement. The one of her lumbar spine showed an impinging bulge at the L5-S1 disc.

22.  At her next appointment with Dr. Bistline on December 16th, the Plaintiff reported that her current medication regimen was relieving her pain. Over the course of subsequent appointments through 2015, Dr. Bistline steadily increased the strength of the pain medication regimen. The Plaintiff reported satisfactory pain relief therefrom with increased daily life activities and without any adverse side-effects.

23.  In February 2015 the Plaintiff reported to Dr. Leotta significant improvement of her right ankle condition. Dr. Leotta described the condition as mostly resolved (some occasional soreness and swelling lingered on, the Plaintiff reported) with no evidence of instability. The Plaintiff did not return to Dr. Leotta thereafter.

24.  In June 2015 the Plaintiff went to the Treasure Coast clinic. She complained of shortness of breath which she attributed to COPD and asthma. She sought medication and inhalers that she reported were helpful in the past. Soon thereafter the Plaintiff felt much better, even without ever

using a nebulizer. The Plaintiff continued to smoke, however, despite the doctor's advice to quit.

25. On September 2, 2015 the Plaintiff saw Dr. Petrilla, a psychologist. In addition to diverse pain complaints, she reported the mental health complaints of forgetfulness, distractibility, poor short-term memory, depression, slow cognition, poor self-esteem, and pessimism. Dr. Petrilla's observations were consistent with those complaints. For example he observed a markedly impaired concentration and short-term memory. The Plaintiff's speech was slurred, and her cognition was impaired. Dr. Petrilla counseled the Plaintiff to shift from a pessimistic to a more optimistic frame of mind.

26. The Plaintiff continued to receive pain management services from Dr. Bistline. Treatment consisted primarily of pain medications. By October 2015 she was taking oxycodone, Zanaflex, Cymbalta, and Voltaren gel. In late October, after the Plaintiff asked for something stronger, the doctor prescribed Duragesic and Norco. The doctor also administered various pain-relieving joint injections.

27. The Plaintiff had been on probation following her release from jail. On September 15th her probation officer tested her for illegal drug use, and the test came back positive for cocaine and amphetamines. She was not sent back to jail, but

she was required to participate in a substance abuse treatment program and to seek mental health treatment. This prompted her to go to the New Horizons mental health clinic. She went on October 12th and again on the 29th.

28.   There at New Horizons the Plaintiff reported a long history of mood and emotional problems, relationship problems, and personality issues. However her mood was stable at these two appointments (in comparison to the prior mental health evaluations of record when she was depressed and tearful). Bioplar Disorder I (in remission) was the primary diagnosis as well as a history of substance abuse and Personality Disorder NOS. The presence of severe psycho-social stressors was noted, and a GAF score of 50 was given. The attendant set up a treatment plan for substance relapse prevention, counseling, and coping skills instruction. The treatment plan required abstinence from addictive substances.

29.   The Plaintiff returned to New Horizons that November and December and again in March 2016. By time of that last appointment the Plaintiff reported no current mental health problems, and the mental status examination was normal. In contrast to early observations of slowed cognition and speech, the Plaintiff was described as articulate. The primary diagnosis was of Mood Disorder NOS. The secondary diagnoses were of PTSD

and substance abuse. Substantial psycho-social stressors remained, and the Plaintiff's GAF score remained at 55. The record contains no subsequent treatment notes from New Horizons, but at the hearing she reported that she goes there for counseling. She also reported taking the psychotropic medications Latuda and Wellbutrin.

30. In March 2016 the Plaintiff began seeing another pain management doctor, Dr. Krost. The Plaintiff complained of low back pain, neck pain, and right foot pain all of which she attributed solely to the bus accident. The physical examination was normal. Dr. Krost diagnosed cervicalgia; mechanical low back pain with reactive myofascial spasm; cervical and lumbar radiculopathy symptoms; and right ankle and foot pain. Dr. Krost renewed the Plaintiff's Fentanyl patch prescription. (Of note, the record does not contain the preceding Fentanyl prescriptions.)

31. In May 2016 the Plaintiff went to the Treasure Coast clinic. She came seeking refills of her asthma medication. She also complained of pain in her right knee that she attributed to falling off a mini-motorcycle a few months beforehand. She described the pain as severe, but an x-ray showed only mild osteoarthritis. There was no acute injury. The Plaintiff saw Dr. Krost on May 10th. He renewed the Plaintiff's oxycodone,

Zanaflex, and Voltaren gel prescriptions. Dr. Krost also noted that the Plaintiff had seen a spine surgeon, Dr. Trinidad, at some point in the recent past. The record contains no treatment notes from that provider.

32. On May 16th the Plaintiff appeared at the administrative hearing. The ALJ re-scheduled the hearing to a later date to give the Plaintiff time to retain an attorney.

33. The Plaintiff returned to the Treasure Coast clinic on June 2nd. She said that her probation officer required a letter from them that says she is unable to work due to physical and mental health impairments. She said that her treating doctor had declined to author such a letter. The health department also declined to write one.

34. On June 7th Dr. Krost administered a battery of tests of the Plaintiff's upper and lower extremity nerves. Those tests were normal: no radiculopathy, neuropathy, or nerve entrapment. However they did show bilateral carpal tunnel syndrome. It appears that a diagnostic arthropathy of the Plaintiff's lumbar spine also was undertaken, but that procedure's findings are unknown.

35. On July 26th Dr. Krost filled out an RFC questionnaire. There the doctor opined that the Plaintiff has a disabling degree of functional impairment. Dr. Krost attributed

her disability to the effects of pain, neuropathy, numbness, respiratory problems, mental illness, and poor memory and concentration.

36.    On July 27th the Plaintiff appeared at the administrative hearing, this time with an attorney. She claimed neck and low back pain that also radiates out to her extremities. She claimed carpal tunnel syndrome pain in her wrists. She takes pain medication including Neurontin (for which the record contains no prescription). Next the Plaintiff claimed mental health impairments caused by bipolar disorder and ADD. She described very limited daily life activities.

37.    At Step Two of the disability analysis the ALJ found the Plaintiff to have the severe impairments of disorders of the back, obesity, and personality disorder. The ALJ did not find the Plaintiff's asthma to meet the definition of a "severe impairment" for Step Two purposes. The ALJ did not find the Plaintiff wholly disabled. Instead the ALJ found the Plaintiff still capable of performing light duty work. As far as the mental demands of work, the ALJ limited her to simple repetitive tasks and occasional social interaction with supervisors, co-workers, and the public.

38.    At Step Five of the disability analysis the ALJ considered the availability of work amenable to her Residual

Functional Capacity ("RFC"). Citing Rule 202.17 of the Medical-Vocational Guidelines and the testimony of the Vocational Expert who also appeared at the hearing, the ALJ found the Plaintiff able to perform the jobs of silver wrapper, shellfish preparer, and merchandise marker. The ALJ therefore concluded that the Plaintiff is not disabled.

39.   Although the evidentiary record is closed, this Court notes the Plaintiff's report that she underwent neck surgery in June 2017 and lumbar surgery in November 2017. This Court also notes the Plaintiff's report that those surgical interventions worsened, rather than relieved, her back pain complaints. This more recent medical information, however, does not relate to the ALJ's Decision and the issues that this Court must consider to review it. For one it comes well after the time period under review. Secondly it does not relate back retrospectively in a way that lends insight to the time period under review. As this Court explains below, there is no confirmed evidence of the need for surgical intervention from the relevant time period. Therefore these later surgeries represent a new development beyond the scope of this analysis.

## DISCUSSION

40.   Judicial review of the Commissioner's decision is limited to a determination of whether it is supported by

substantial evidence and whether the proper legal standards were applied. See Lewis v. Callahan, 125 F.3d 1436 (11th Cir. 1997). Supporting evidence need not be preponderant to be substantial so long as it amounts to more than a scintilla; in other words, it is such relevant evidence that a reasonable person might accept as sufficient and adequate to support the conclusion reached. See id. at 1440. If the decision is supported by substantial competent evidence from the record as a whole, a court will not disturb that decision. Neither may a court re-weigh the evidence nor substitute its judgment for that of the ALJ. See Wolfe v. Chater, 86 F.3d 1072 (11th Cir. 1996). See also, Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002). While the Commissioner's factual findings enjoy such deference, a court is free to review the Commissioner's legal analysis and conclusions de novo. See Ingram v. Comm'r, 496 F.3d 1253, 1260 (11th Cir. 2007). See generally, Jordan v. Comm'r, 470 Fed.Appx. 766, 767-68 (11th Cir. 2012).

41.    This Court begins by reviewing the ALJ's findings regarding the Plaintiff's claimed physical health impairments. In doing so this Court applies Social Security Regulation 16—3p which sets forth the standard for determining the degree to which claimed symptoms reduce a claimant's functional ability.

See generally, Hargress v. Comm'r, 883 F.3d 1302 (11th Cir. 2018) (applying the SSR 16—3p standard).

42.  The ALJ did not find the Plaintiff to have a disabling degree of pain or other physical impairment. The ALJ found the record evidence not to support the degree of pain-related impairments that she claimed. The nature of the treatment that she received was overall conservative, consisting primarily of pain medications---which reportedly was a success. The objective medical evidence suggests no underlying medical condition that reasonably could be expected to cause the degree of pain claimed. Similarly the physical examinations were overall unremarkable and relatively non-severe.

43.  Having reviewed the entire Administrative Record, this Court sees sufficient evidence to support the ALJ's analysis. The existing record shows complaints of severe and wide-spread pain going back to September 2003. Those pain complaints therefore pre-date much of her employment history as a home health aide and as a vet tech without any apparent hindrance to her ability to do those jobs.

44.  The Plaintiff again complained of back pain after her September 2012 car accident, and evidently it was that injury evident that precipitated the filing of her disability application in January 2013. However the objective medical

evidence generated in response to it simply fails to show either a neck or low back condition that would correlate with very severe pain. It is true that Dr. Simon recommended low back surgery in late December 2012, but he based that recommendation on the presence of a herniated disc that the MRI does not show. Nor are his own subsequent treatment notes consistent with the need for surgery. Instead, in February 2013, his practice referred the Plaintiff to pain management services.

45. It does not appear that the ALJ mentioned the Physical Capacities Evaluation that Dr. Douglas, DC, filled out in June 2013 (and found in the record at page 469). However this Court sees no reversible error in this shortcoming. For one, a chiropractor is not considered an acceptable medical source. See 20 C.F.R. § 404.1527(a)(2) and SSR 06-03p. Even if he were, no contemporaneous treatment notes accompany that questionnaire either from Dr. Douglas or from any other medical provider. Indeed the Plaintiff later told Dr. Bistline in October 2014 and Dr. Krost again in March 2016 that all of her pain complaints had resolved fully by time of the bus accident in October 2014.

46. The Plaintiff's initial pain complaint after that bus accident concerned her right foot and ankle, but treatment notes show the successful treatment of that condition. She also attributed back pain to that accident. The medical evidence

shows no acute back injury resulting from that accident, however. An MRI taken in December showed two bulging discs---one in her neck and one in her low back. Both bulges also had an impinging effect. This MRI constitutes evidence of a spinal condition that is relatively non-severe. They show no herniations, for example, as the ALJ noted. Dr. Baynham who reviewed those MRI's later in October 2015, described them as showing no significant abnormality. In any event, regardless of the relative severity of what those MRI's show, the Plaintiff reported satisfactory pain control from pain management.

47. In March 2016 the Plaintiff transferred her pain management care to Dr. Krost. On July 26th, the day before the administrative hearing, Dr. Krost filled out an RFC questionnaire. As the ALJ found, the pronounced degree of impairment that Dr. Krost describes there are disproportionate even to what Dr. Krost's own treatment notes suggest. The record contains only one prior treatment note from Dr. Krost, the one from March 2016. This means Dr. Krost lacked the insight of an established treating relationship. The nerve conduction studies he administered in June were largely negative for spine-related radiculopathy. Thus the ALJ states good cause for discounting Dr. Krost's opinion.

48.  Wide-spread and generalized back pain was the primary physical impairment that the Plaintiff claims. To it, she adds a few complaints of a more particularized nature. She claims right ankle pain, but as noted above, treatment soon relieved that condition. The Plaintiff complains of knee pain, but as the ALJ noted, the treating provider, ARNP Wheeler, found no objective medical evidence to corroborate it. The ALJ explained why he did not find the one bout of respiratory-type complaints to rise to the level of a severe impairment. The ALJ added that the Plaintiff continued to smoke despite medical advice to quit. As for any impairment related to the Plaintiff's weight, the ALJ made accommodation for it within the scope of the RFC assessment.

49.  This Court discusses next the mental component of the Plaintiff's disability claim. The Plaintiff emphasizes in her summary judgment motion that she intended her application to be comprehensive, including both physical and mental health impairment claims. She says that anger and authority problems hindered employment. The record contains at page 401 a letter from her sister describing her mental health history.

50.  Although the Plaintiff does include a mental health claim in her application, it was not the focus of her disability application nor importantly the focus of her medical history.

The Plaintiff's medical history has consisted primarily of pain management. What mental health evidence there is of record simply does not corroborate the presence of a disabling condition. This is an important point. To establish disability, a claimant must do more than allege the presence of a mental health impairment. The claimant must corroborate that allegation with evidence. (The same goes for her pain-based impairment as this Court discusses above, Social Security law requires objective medical evidence to corroborate her allegation of severe pain.)

51.    Two consultative psychological evaluations were undertaken, the first in September 2008 and the second in March 2013. They yielded diagnoses of mood and personality disorders (as well as of somatic pain disorders). Thirdly, in September 2015, the Plaintiff saw the psychologist, Dr. Petrilla. It does not appear that the Commissioner sent the Plaintiff to Dr. Petrilla, however. This Court presumes instead that the Plaintiff saw him on her own. In any event Dr. Petrilla counts as only a one-time examining source; there are no other treatment notes from him. The ALJ found Dr. Petrilla's report to be disproportionate to what the rest of the medical record suggests. The above three psychologists did observe depression symptoms, but it is noteworthy how the physicians who were

treating the Plaintiff contemporaneously did not. Indeed the non-mental health providers (physicians, pain management doctors, etc.) who have treated the Plaintiff over the full course of the record generally report no mental health concerns.

52. Nor did the Plaintiff pursue mental health treatment. It was not until October 2015 when the Plaintiff began going to the New Horizons mental health clinic. She went, however, on the instructions of her probation officer. At New Horizons the Plaintiff reported a long history of mood and emotional problems, but the attendant observed few present symptoms of such. As the ALJ noted, New Horizons' treatment notes show an overall non-severe and unremarkable mental health condition. They show quick and substantial improvement.

53. The foregoing evidence does not corroborate the Plaintiff's allegation of a disabling mental health impairment. There is no evidence to show that the Plaintiff's alleged mood and emotional disorders are of a certain severity, and there is no evidence that links a medically-determinable mental health condition to work-related problems. Moreover there is no evidence that shows ongoing work-related problems despite active mental health treatment and treatment compliance.

54. It follows then that this Court sees no reversible error in the ALJ's discussion of the record evidence or in the

RFC that he found the record evidence to show. In other words competent, substantial evidence supports the RFC that the ALJ assessed. This Court also finds that competent, substantial evidence supports the ALJ's vocational findings.

## CONCLUSION

55. It is not for this Court upon judicial review to re-weigh the evidence or reach findings of fact anew; such is the responsibility of the ALJ as the fact-finder in this case. In other words Social Security law does not permit this Court to make its own decision about the Plaintiff's disability application. Social Security law instead limits the scope of consideration to reviewing the ALJ's decision on appeal. This Court's review is limited to ensuring that the ALJ's findings of fact are supported by competent, substantial evidence and that the decision comports with the governing law and regulations. Social Security law thereby requires a certain degree of deference to the ALJ's decision. Having reviewed the parties' arguments and having independently and carefully reviewed the whole record, this Court finds the decision to have such support, with no grounds warranting reversal or remand.

It is therefore,

**ORDERED AND ADJUDGED** that the Plaintiff's Motion for Summary Judgment (DE 16) is **DENIED**. In affirming the ALJ's

decision, the Defendant's Motion for Summary Judgment (DE 14) is **GRANTED**.

**DONE AND ORDERED** in Chambers at Fort Pierce, Florida, this ⏵3ᵗʰ day of June, 2018.

_____
SHANIEK M. MAYNARD
UNITED STATES MAGISTRATE JUDGE

CC: Carlos J. Raurell, AUSA (via CM/ECF NEF)

Kelly M. McCartney, pro se
PO Box 650731
Vero Beach, FL   32965